McDONALD'S CORPORATION, Plaintiff-Appellee, v. FIRST NATIONAL BANK OF LAKE FOREST, n/k/a Northern Trust Bank/Lake Forest, as Trustee, *et al.*, Defendants-Appellants.

Second District No. 2—92—1230

Opinion filed November 30, 1993.

Donald T. Morrison and Peter N. Weil, both of Morrison & Morrison, P.C., of Waukegan, for appellants.

Murray R. Conzelman, of Conzelman, Snarski & Stepanich, of Waukegan, for appellee.

JUSTICE GEIGER delivered the opinion of the court:

The plaintiff, McDonald's Corporation (McDonald's), filed this declaratory judgment action against the defendant, First National Bank of Lake Forest, now known as the Northern Trust Bank/Lake Forest, as trustee under trust No. 7955, and Wauconda Associates (hereinafter referred to collectively as the Developer). McDonald's and the Developer each own a portion of the Liberty Square Shopping Center (shopping center). McDonald's sought a declaration that agreements that it entered into with the Developer concerning the development and operation of the shopping center prevented the Developer from

constructing a Taco Bell pylon sign on the shopping center. The trial court entered judgment for McDonald's and the Developer appeals.

On August 6, 1991, McDonald's filed its complaint for declaratory relief. This complaint alleged that McDonald's and the Developer each owned parcels of a larger parcel of land which together formed the shopping center. McDonald's further alleged that the Developer was proposing to construct a pylon sign on this shopping center to advertise Taco Bell and that McDonald's objected to this sign. Attached to the complaint were the following agreements between McDonald's and the Developer in connection with the shopping center: (1) the purchase and sale agreement, (2) the "Development Agreement," and (3) the "Declaration of Establishment of Protective Covenants, Conditions and Restrictions and Grants of Easements" (Declaration).

The Developer counterclaimed for a declaration that (1) the agreements entitled it to construct the pylon sign; (2) McDonald's impliedly consented to the construction of the pylon sign; or (3) that McDonald's refusal to agree to the construction of the pylon sign was unreasonable.

The cause proceeded to a bench trial on September 8, 1992. The following testimony was presented at trial. In 1986, McDonald's agreed to purchase a parcel of the Developer's yet undeveloped shopping center at the intersection of Routes 12 and 176 in Wauconda. McDonald's and the Developer further agreed to develop the shopping center jointly.

During 1986 and early 1987, the parties negotiated and executed their three agreements. The purchase and sale agreement set forth the terms under which McDonald's would acquire the property from the Developer. The parties executed this agreement on December 11, 1986. The Development Agreement concerned the obligations of the parties in connection with the construction of the property, the installation of parking lots, lighting, and landscaping. The parties executed this agreement on April 7, 1987. The Declaration concerned the obligations of the parties for the operation and maintenance of the shopping center after the development was completed. The parties executed this agreement on April 1, 1987. The Declaration, which runs with the land, was recorded with the Lake County recorder of deeds on April 28, 1987. The parties' agreements incorporated a "plot plan" of the shopping center (exhibit C).

The parties contemplated that the largest business in the shopping center would be a Jewel-Osco. They further contemplated that, in addition to McDonald's, various other businesses would occupy the shopping center. The agreements also explicitly provided for the erec-

tion of two pylon signs. A witness for the Developer defined "pylon sign" as a free-standing sign that is at least 10 feet high and that advertises a project or a tenant within a project. One of these pylon signs would identify Jewel-Osco, McDonald's, and one other major tenant; it would be located at the entrance to the shopping center. The other sign would identify McDonald's only and would be next to Route 12. The plot plan reflected the location of these two pylon signs.

The development of the shopping center apparently proceeded as the parties had contemplated until 1990. In June 1990, the Developer approached McDonald's about attaching a Taco Bell sign to the 85-foot McDonald's sign. On June 18, 1990, McDonald's denied the Developer's request because it was contrary to McDonald's corporate policy to place a competitor's advertising on its sign. On April 15, 1991, the Developer requested that McDonald's approve the construction of a separate 65-foot pylon sign that would identify Taco Bell. This pylon would also be along Route 12, northwest of the McDonald's sign. This proposed sign was not to be on McDonald's property. According to the Developer, Taco Bell had requested that the Developer obtain permission from McDonald's before the Developer constructed the sign.

Johnny Melendez, real estate manager for McDonald's, initially flatly declined to approve the Taco Bell sign. According to Melendez, Taco Bell had previously impeded McDonald's from building a restaurant in a shopping center in Downer's Grove. Melendez, therefore, "was not inclined to approve anything for Taco Bell." Thereafter, the Developer performed a sign test to determine whether the proposed sign would obscure the McDonald's sign. The test revealed that from one spot on Route 12, the proposed Taco Bell sign would obscure a portion of the McDonald's sign so that the Golden Arches would appear to be on top of the Taco Bell sign. Melendez presented the matter to McDonald's management; pursuant to his recommendation and, according to Melendez, based solely on the sign test, management denied the Developer's sign request.

Other evidence showed that prior to proposing the Taco Bell sign, the Developer constructed a pylon sign for Kentucky Fried Chicken. McDonald's did not object to the Kentucky Fried Chicken sign.

On October 1, 1992, the trial court entered an order finding that the Declaration clearly and unambiguously expressed that "there be two and only two pylon signs." The trial court reasoned that because the Declaration gave McDonald's rights over the shopping center that extended beyond its own property, and because the Declaration pro-

vided for two specific pylon signs whose location could not be changed without the consent of the parties, the Declaration expressed the parties' intent to limit the number of pylon signs. The trial court further stated that "[n]o resort to rules of construction is necessary since the language of the declaration is clear and unambiguous." The trial court entered judgment for McDonald's and against the Developer on both parties' claims.

On appeal, both parties argue initially that the contracts in question are clear and unambiguous. The Developer argues that nothing in any of the three agreements limits the number of pylon signs that the Developer may construct on the property. According to the Developer, restricting its ability to develop its property, when such a restriction does not expressly appear in the Declaration, would violate its natural right to use its own property. The Developer also argues that even if the contract language is ambiguous, McDonald's conduct in failing to object to the Kentucky Fried Chicken sign shows that the parties did not attempt to limit the number of pylon signs. The Developer further maintains that McDonald's could not have reasonably objected to the Taco Bell sign based on the results of the sign test.

McDonald's argues, on the other hand, that the trial court correctly determined that the agreements clearly and unambiguously limited the shopping center to two pylon signs. According to McDonald's, it is the Developer's interpretation of the agreement that leads to an absurd result because, under that interpretation, nothing would stop the Developer from erecting an unlimited number of signs blocking the McDonald's sign.

The trial court's finding that the clear, unambiguous language of the Declaration favored McDonald's was a finding of law. (See *U S G Interiors, Inc. v. Commercial & Architectural Products, Inc.* (1993), 241 Ill. App. 3d 944, 947.) Therefore, we will review that finding *de novo*.

The critical provision of the Declaration is section 3.2(h). As part of the Declaration's section 3, section 3.2(h) addresses use of the shopping center's common area, generally, under the Declaration, all the shopping center area other than that occupied by buildings. Section 3 provides that the permissible uses of the common area are "Parking" and "Service." Section 3.2 defines the term "Parking" and provides as follows:

> "The term 'Parking' as used herein shall mean and be deemed to include and permit the following:
> * * *
> (h) The construction, maintenance, repair, replacement and

reconstruction of sign pylons and/or monument signs (with appropriate underground electrical connections) at the locations marked on Exhibit 'C', which locations shall not be changed without the prior written consent of Developer and McDonald's. Subject to the exception [for advertising or identification signs adjacent to the building area]—specified in Paragraph 2.3(c) hereof, all shopping center pylons and identification signs shall conform to sign criteria approved by Developer. The cost and expense incurred in erecting and maintaining such pylons (and the identification signs thereon) shall be apportioned in accordance with the percentages of the total square feet of (pylon) sign space in the shopping center utilized to identify each party. The pylon sign identified as 'Pylon Sign A' on Exhibit 'C' hereto may identify the shopping center, the supermarket, and two (2) other major tenants, only. The pylon sign identified as 'Pylon Sign B' on Exhibit 'C' may identify McDonald's only."

Also critical in our analysis here is section 2.2(a) of the Declaration. It provides, in part:

"Except as shown on Exhibit 'C', no building or other structure shall be erected, or placed, on any part of the Entire Property until or unless the location shall have been delegated. Such approval shall not be unreasonably withheld, and any written request for such approval within twenty (20) days of its receipt shall constitute an unqualified and irrevocable approval of the specifications and drawings submitted to such non-responding party. In the event that either Developer or McDonald's withholds such approval and the owner of such building believes that such withholding of approval is unreasonable, then the dispute shall be arbitrated in accordance with the laws of the State of Illinois. ***

Notwithstanding the above, all buildings and/or structures constructed or altered that substantially conform with like buildings of Developer in the shopping center shall be deemed approved."

In its order, the trial court's analysis focused on the content of these sections. The court specifically referred to the Declaration's description of the pylon signs "allowed by the Declaration" and their location "in fixed places that cannot be changed without mutual consent." Apparently reasoning therefrom, it found that the Declaration's "clear and unambiguously expressed intent" was that "there be two and only two pylon signs."

We find that the court incorrectly concluded that the Declaration unambiguously limited the shopping center to two pylon signs. While section 2.2(a) allows McDonald's a right to reasonably withhold a request for approval of a "structure," apparently including a pylon sign, it provides no basis for a declaration that the Declaration unambiguously limits the shopping center to two pylon signs. Further, we find no indication in any of the parties' documents that the identification of the two pylon signs "A" and "B" was meant as a limit on the number of pylon signs allowable at the center.

We note, for example, that the first sentence of section 3.2(h) identifies two specific pylon signs. It sets limits upon changes to the parties' agreements on the nature and placement of those signs. Similarly, the last two sentences of section 3.2(h) specifically describe the parties' agreements regarding "Pylon sign A" and "Pylon sign B." However, the specification of an allowed use will not be read as a statement of explicit prohibition of other uses (see *Lake Barrington Shore Condominium Ten Homeowners Association v. May* (1990), 196 Ill. App. 3d 280, 283), and we find that these references in section 3.2(h) do not limit the center to the two described signs.

The second sentence of section 3.2(h) is more general than the first, describing the conformity requirements for "all [nonadjacent] shopping center pylons and identification signs." That language, like the above-referenced language, accommodates the existence of more than the two already agreed pylon signs. Furthermore, the following sentence, in its reference to "such pylons" provides no limit itself.

In its claim of contractual limitation of the number of pylon signs allowable at the shopping center, McDonald's additionally relies upon section 8.1 of the parties' Development Agreement. Section 8.1 sets out the parties' agreement on the description of, the installation of, and the cost sharing on the two agreed pylon signs. It, however, like section 3.2(h) of the Declaration, omits any reference to an intended limitation on the number of pylon signs allowed at the shopping center.

McDonald's also refers us to sections 4.4 and 4.4(c) of the Declaration and argues that other sections of the agreement do not override the specific limitation given in section 3.2(h). As we conclude that neither section 3.2(h) nor any other contract provision provides any specific limitation on the number of pylon signs allowed at the shopping center, we need present no extended analysis of these arguments.

In conclusion, we find that the parties' contracts do not provide any explicit and unambiguous limit on the number of pylon signs allowed at the shopping center. Given that conclusion, plus the general

rule of construction that weighs against imposition of a limitation on the free use of property, where the use in question is not explicitly prohibited (see *Lake Barrington*, 196 Ill. App. 3d at 283), we find that the trial court's order of declaratory relief favoring McDonald's and against the Developer was an abuse of its discretion (see *Nussbaum Trucking Co. v. Conley* (1992), 236 Ill. App. 3d 809, 811). We find that although the Declaration reveals an unambiguous intent by the parties to insure the fulfillment of their earlier agreements regarding two pylon signs, it does not eliminate the possibility of additional pylon signs—although it provides McDonald's a right to timely expression of reasonable objections.

Based on the foregoing, we reverse the judgment of the circuit court of Lake County. Because factual determinations remain on the Developer's counterclaim, we remand the cause for further proceedings on that counterclaim, consistent with our decision.

Reversed and remanded.

BOWMAN and COLWELL, JJ., concur.